# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 28, 2011

## STATE OF TENNESSEE v. ANTYWON MONTRACE BEASLEY

**Appeal from the Criminal Court for Hamilton County**
**No. 264539      Don W. Poole, Judge**

---

**No. E2011-00780-CCA-R3-CD - Filed June 26, 2012**

---

The defendant, Antywon Montrace Beasley, appeals the Hamilton County Criminal Court's denial of his request for probation. The defendant pled guilty to one count of attempted aggravated child abuse, a Class B felony, and received a sentence of ten years, with the manner of service to be determined by the trial court. Following a hearing, the court determined that the sentence was best served in confinement. On appeal, the defendant contends that this determination was error. Following review of the record, we find no error and affirm the sentence as imposed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Ardena J. Garth, District Public Defender, and Richard Kenneth Mabee and Alan Dunn, Assistant Public Defenders, for the appellant, Antywon Montrace Beasley.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; William H. Cox, III, District Attorney General; and Leslie A. Longshore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

**Procedural History**

In July 2007, the defendant was indicted by a Hamilton County grand jury for one count of aggravated child abuse. In 2010, he entered a guilty plea to the lesser offense of attempted aggravated child abuse with an agreed sentence of ten years. However, the agreement provided that the trial court would determine the manner of service of the sentence. A hearing was held on the matter on March 28, 2011, at which multiple witnesses testified.

The first witness called was Dr. Greg Talbott, an expert in pediatric intensive care and abusive head trauma, who supervised the pediatric intensive care unit where the victim in this case was treated. According to Dr. Talbott, the victim, the defendant's two-month-old daughter, was brought to the emergency room on July 16, 2006, and was later transferred to the pediatric intensive care unit where he treated her. He elaborated that the victim was in critical condition when she arrived at the hospital and "required medical intervention to sustain her life." The victim was placed on a ventilator because of an acute brain injury, specifically a subdural hematoma, which prevented her from breathing on her own. Dr. Talbott testified that these type injuries normally occur when the head is forcefully placed in a rotation, *i.e.*, shaken baby syndrome. He continued that he observed no evidence of bruising or swelling on the scalp, which indicated the injury was not caused by blunt force trauma. During the examination, Dr. Talbott also observed bone calluses on the victim's rib cage, which were caused by broken bones that had partially healed.

Based upon his initial examination, Dr. Talbott ordered an examination by an eye specialist, whose examination revealed that the victim also suffered from unilateral retinal hemorhaging, which is indicative of abusive head trauma. Dr. Talbott also ordered a complete skeletal survey to confirm his initial diagnosis of prior rib fractures. The test revealed approximately fourteen individual bone breaks in various stages of healing. Dr. Talbott made clear that the bone fractures did not occur at the same time as the head injury, although he was unable to give an exact date as to the age of the prior injuries.

Dr. Talbott stated that he spoke with the defendant, the victim's father, who had brought her to the hospital. According to the defendant, he witnessed the victim fall off the bed and hit her head on the floor. The defendant also indicated that the victim had initially been responsive, but then stopped breathing before he rushed her to the hospital. Dr. Talbott indicated that the victim's injuries were not consistent with the defendant's version of events. Rather, the injuries were consistent with "abusive injury rather than a fall onto a hard surface." He testified that, in his opinion, "there is no doubt that the constellation of these injuries indicate abusive injury to this child." As a result of this opinion, police and child services were called to investigate.

Detective Josh Meyer indicated that he responded to call from the children's hospital

on July 16, 2006, concerning a report of suspected child abuse. Upon arriving at the hospital, Detective Meyer was informed by the Child Protective Services worker that the parents of the victim had left the hospital and gone home. The two then proceeded to their home. The defendant told Detective Meyer, as he had Dr. Talbott, that the victim had incurred her injuries by falling off the bed. Detective Meyer stated that he noted that the bed was "standard height" and that the floor was covered in concrete tiles. He briefly questioned the defendant at the home, but later took him to the police station and where he gave a formal statement.

The defendant told Detective Meyer that he had returned home with his children and placed the victim on the center of the bed. He had then gone to the kitchen to get food and, upon returning to the bedroom, observed his two-year-old child pulling on the bedspread, which pulled the victim off the bed. The defendant stated that the victim landed on her head. The defendant also related to the detective that he was unemployed and that he functioned as the primary caregiver to the victim. He stated that the only person who had kept the child in the previous three weeks was the child's mother's sister. Detective Meyer testified that, while the victim's mother, was initially charged as well, the charges were later dismissed.

The State also called Andrea Braswell to testify. She stated that she had become the victim's foster mother when she was seven months old, along with some of the victim's siblings. According to Ms. Braswell, she was informed that the victim had shaken baby syndrome. She indicated that she had previously dealt with other children with shaken baby syndrome, but the victim's case was the worst she had ever seen. She testified that the victim was not responsive, made no eye contact, made no sounds, could not swallow properly, and had difficulty nursing from a bottle. She indicated that the victim had to have a feeding tube put in and eventually began having outbursts. As the victim aged, she did not begin to speak and was eventually placed in speech therapy, as well as physical therapy. When the victim left her care, she was almost three years old, and had just begun to walk and could speak a few words. Ms. Braswell indicated that the victim had made great progress but stated that she had a long way to go to catch up to her peers' level of development. On cross-examination, Ms. Braswell stated that the defendant had seen the victim during her stay with Ms. Braswell, pursuant to supervised visitation, and that she saw no alarming behavior on the defendant's part.

The final witness for the State was Bryan Johnson of the Tennessee Board of Probation and Parole, who prepared the pre-sentence report in this case. He stated that he discovered that the defendant had prior convictions for failure to carry a license and exhibit on demand and for theft under $500. Mr. Johnson also testified that the defendant had informed him that he worked at Game Stop in 2008, as well as two other jobs. Mr. Johnson was unable to verify employment at the two other sites. Mr. Johnson also indicated that he

had prepared an addendum to the pre-sentence report which contained a statement of the defendant's mental health treatment, which indicated future treatment would be "challenging."

The defense proof consisted of testimony from the defendant and his current girlfriend. Sherry Murphy testified that she had been seeing the defendant for a little over a year and that he could live with her if he received an alternative sentence. She stated that she would be willing to transport him to any appointments pertaining to his supervised release. She also testified that she had just given birth to the defendant's child a few weeks prior, his seventh child, and indicated that she had no qualms about the defendant being around the child.

The last witness to testify was the defendant himself. He stated that he was twenty-six years old and that he had a job working on cars at EHS Enterprise lined up if he were to be released on probation. He also gave testimony to the effect that he had completed parenting and anger management classes prior his being charged in this case and supplied documentation to verify this. He also related that he had completed a Bible study course and was now teaching Bible study classes to his fellow inmates in jail.

During his testimony, the defendant maintained that the injuries to the victim had been caused by her falling off the bed. He reiterated the same story he had told Detective Meyer that: he had laid the victim down on the bed and gone to the kitchen to get something to eat for his other children; he returned to the bedroom in time to see his young child pulling the blanket, which the victim was lying on; he saw the victim fall to the floor, hitting her head. The defendant indicated that he rushed the victim to the hospital and denied ever intentionally hurting any of his children.

According to the defendant, he had only resided with the victim and her mother for about twenty-eight days. He denied telling Detective Meyer that he lived with them for two months, despite the transcript of the interview which stated to the contrary.

After hearing the defendant's testimony, the State called Billy Higley as a rebuttal witness. Mr. Higley is the owner of EHS Industries, and he denied knowing the defendant or extending any offer of employment to him.

After hearing the evidence presented, the trial court ordered that the ten-year sentence be served in confinement. The defendant now appeals that decision.

**Analysis**

-4-

On appeal, the defendant's sole contention is that the trial court erred in denying him an alternative sentence, specifically probation. He asserts that "[p]robation under strict conditions would have been adequate and reasonable" to avoid depreciating the seriousness of the offense.

When reviewing sentencing issues, the appellate court shall conduct a *de novo* review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d) (2010). "[T]he presumption of correctness 'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If . . . the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." *Id.* at 345 (citing *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)). The defendant bears "the burden of showing that the sentence is improper." *Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Under the revised Tennessee sentencing scheme, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *Carter*, 254 S.W.3d at 347 (citing T.C.A. § 40-35-102(6)). Instead, a defendant not within "the parameters of subdivision (5) [of Tennessee Code Annotated section 40-35-102], and who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." *Id.* Additionally, we note that a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider" them. T.C.A. § 40-35-102(6) (emphasis added).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. T.C.A. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. *Id.* at 303(b); *see also State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. *Bingham*, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. *Id.* Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present

condition, the need for deterrence, and the best interest of the defendant and the public. *Goode*, 956 S.W.2d at 527. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997); *Bingham*, 910 S.W.2d at 456. Denial of probation may be based solely upon the circumstances of the offense when they are of such a nature as to outweigh all other factors favoring probation. *Bingham*, 910 S.W.2d at 456.

A trial court may deny alternative sentencing and sentence a defendant to confinement based on any one of the following considerations which establish "evidence to the contrary" to rebut a defendant's status as a "favorable candidate" for alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1). In choosing among possible sentencing alternatives, the trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment." T.C.A. § 40-35-103(5); *State v. Dowdy*, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). The trial court may consider a defendant's untruthfulness and lack of candor as they relate to the potential for rehabilitation. *State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); *see also Dowdy*, 894 S.W.2d at 305-06. Finally, the court may also consider the mitigating and enhancing factors set forth in Tennessee Code Annotated sections 40-35-113 and -114. T.C.A. § 40-35-210(b)(5).

The trial court, in imposing a sentence of confinement, made the following findings on the record:

> [The defendant] is twenty-six years of age . . . and has seven children, presently apparently single. He is before the Court for sentencing having pled guilty . . . to the Class B felony of attempted aggravated child abuse. . . .
>
> In setting an appropriate sentence for [the defendant], I consider the principles of sentencing set forth in Tennessee Code Annotated Section 40-35-103. I consider the plea that has been entered today to . . . attempted aggravated child abuse. I consider everything that has been presented at this

hearing today. I consider the testimony of Dr. Talbott, . . . the testimony of the foster mother, . . . Ms. Andrea Braswell, . . . the testimony of Officer Josh Meyer, . . . the testimony of Mr. Bryan Johnson who wrote the presentence investigative report, [and] . . . the presentence investigative . . . .

I consider the testimony of Ms. Sherry Murphy, who has just given birth to [the defendant's] seventh child and apparently indicates that she has a home for him to live. I consider the testimony of [the defendant]. . . . And also Mr. Billy Higley who has testified. The presentence investigative report, every bit of evidence that has been presented at this sentencing hearing. The background of Dr. Talbott, the history of the treatment of this two month old child. The addendum to the presentence investigative report. I think that's extremely important. That was not only an addendum to the report but that was also introduced in the sentencing memorandum filed by the defendant. I consider the sentencing memorandum filed by the defendant, the certificates that he has filed on his own behalf, the Bible study certificates and the statements from his fellow cell mates. So all that has been considered in determining what would be the appropriate sentence today. . . .

Certainly in any case like this you have to consider the nature and characteristics of the criminal conduct involved and I think it goes without saying that there was ample proof that the individual who perpetrated this act upon this two month old child was actually guilty of aggravated child abuse.

[The defendant] based upon the proof that has been introduced at the hearing, certainly I understand the reason for the plea that's been entered but he did enter a plea to an attempt to commit a Class A felony. So the nature and circumstances of the criminal conduct are horrible. This child was treated horribly and sustained horrible injuries and we have heard about those injuries from the doctor and from the foster mother.

In regard to the mitigating and enhancing factors, both lawyers have ably argued what should be considered for mitigating and enhancing factors and the presentence investigative report, [defendant's trial counsel] argues that several things should be considered as far a mitigating factor, most of which would come under the catchall of Rule 13. I don't think it is a mitigating factor that he took this child to the hospital. I don't see, he indicates he is remorseful for his actions today, I don't see that, I don't think that is a mitigating factor. I don't see as a mitigating fact of the support of a loving family. Certainly I considered the testimony of Ms. Murphy today who has

testified for him.

Based upon the presentence investigative report, . . . there is some evidence of his father not being involved in his life. I don't know that's a mitigating factor. Apparently child support was paid according to him but I don't consider that a mitigating factor. I will give him and consider to a certain extent some mitigating [in] that [the defendant] had in fact completed a parenting class, an anger management class and other classes, some of which he did on his own, so I consider that somewhat mitigating in regard to the sentencing. The Tennessee Community Counseling Service, he sought their advice for counseling. Based upon that report, I don't know that it is completely helpful but he did at least seek that advice. He indicates that he intends to go to college. But the only mitigating factor under Rule 13 is he did go out on his own and seek to better himself by anger management, by parenting and going through counseling.

Now, as far as the enhancing factors are concerned, I do think No. 1 is there. He has a history of prior criminal conduct. No one has said a great deal about that fact, I think it's important, that he did commit a criminal act after this criminal act. It hasn't been a decade ago, this was in 2008. He has been found guilty of theft but he also has a driving history or driving record which is not of great concern but I do think there is some indication that the enhancing factor of prior history, certainly the law tells us that we can consider what happens while he is on bond and should consider that he has pled guilty to theft.

Now, the other things that are argued by the State, I do find some of these here. The law tells us that even though age is an element of this offense, that vulnerability of this child can be considered because a child two months old can't cry out for help, can't see help, can't say momma, daddy, I'm hurting, so I do think this child was vulnerable. I do find that No. 4 is true that this two month old child was particularly vulnerable because of age even though age is involved in the actual aggravated child abuse itself. I think the argument about the injuries, the personal injuries are great. Even though great, I think the law is a little bit more clouded on that. I won't find that as being an enhancing factor.

I do find that this is a position of trust. This is the father and this is how he treated this two month old child, so I do find that enhancing factor is there.

. . . .

I consider the statistical information, went through and checked on the statistical information from the Administrative Office of the Courts.

After the effective date of the new law in June of 2005, 61% of the people were incarcerated for Class B Felony, 22% received probation, 15% received some split confinement. The average or mean length of incarceration was about what [the defendant] pled guilty to, 119 months is what those guidelines at least tell us as far as what the statistical guidelines say.

I want to say something about the testimony of [the defendant]. I said I would refer back to that and that certainly is an important issue. I don't find [the defendant] to be credible in several important issues. Now, he apparently has always indicated that he didn't do it to the child, the child rolled off the bed and that's what happened. So I don't find based upon the proof that I have heard today that this is a credible explanation. I think the credibility of [the defendant] is attacked in other ways as well. He says today, you know, for three or four weeks he had some contact and this is certainly not what he told the Officer Josh Meyer about being the sole care giver of this child, that's not what he told [Doctor] Talbott . . . so his credibility is stretched there in regard to that.

I find also that this young lady, Ms. Murphy, who testified for him that he is going to live or apparently going to live with her but he told the presentence investigative report that he wanted to live alone, he didn't want to live with Ms. Murphy. This is the young lady who gave birth just a few days ago, three months after another young lady had given birth to his sixth child back in December of 2010. I do find that he is not credible in many of the statements that he makes. I don't think he helps himself in regard to his sentencing. I think the overwhelming proof is, the proof I have heard would indicate that he did in fact commit these acts upon this child but he has refused to accept any responsibility for that.

Now, as far as his potential for rehabilitation and treatment, I consider all the factors that I have considered. Now, I will say this. He has pled to a ten year sentence. He is eligible under the Tennessee law for probation. He has pled to a Class B felony, as such under the Tennessee law he is not considered a favorable candidate for alternative sentencing but he is eligible for probation. I think in regard to rehabilitation and treatment, I read the thing

-9-

he presented from the Tennessee Community Corrections in regard to counseling. "He impresses as being psychologically immature, irresponsible, any attempts to treat [the defendant] would be very challenging at the least and without his being mandated by court order to engage in such treatment, he would probably terminate his treatment in short order. The prognosis for long term change is guarded at best, more than likely poor."

So I think his chances for rehabilitation in regard to that are poor. I think the fact that if you have a Class A felony facing you and you go out and commit a theft, I think you possibilities for rehabilitation or treatment are not great.

All that said, and [defendant's trial counsel] argues, and correctly so, that the law in Tennessee says, specifically 40-35-103 that even though it's a Class B felony, he is eligible for consideration and before somebody is confined, the courts need to look at several other things. (A), confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct. It is argued by the State that criminal behavior of him treating this child is there but as far as criminal convictions, criminal conduct, it's not there. So that's not there.

[B]. Measures less restrictive than confinement have frequently or recently been applied. That's not true in [the defendant's] case.

[C]. Confinement is necessary to avoid depreciating the seriousness of the offense, and particularly suited to provide an effective deterrent.

The law tell us when Judges use this that you should look at the fact, as horrifying, shocking, reprehensible, offensive or otherwise excessive or exaggerated. I do think that the fact in this case are in fact that and I think the case would be depreciated by not sentencing [the defendant] to confinement. I think that is there. I think the facts are horrible. In spite of overwhelming proof, [the defendant] continues to deny that he was involved, he continues to tell the doctor another thing, he continues to tell his most recent fiancee another thing about where he would be living. So I don't think that he can live outside confinement with any possibility of rehabilitation.

Based upon all that on the charge of attempted aggravated child abuse, I sentence [the defendant] to ten years in the Department of Corrections as Range I, Standard Offender, to serve.

The defendant argues that the trial court erred because the record fails to support the finding that confinement was necessary to avoid depreciating the seriousness of the offense. On appeal, he bases his contention of error upon the facts that: (1) neither the trial court or the State provided any statistics or reasoning that confinement would deter others from committing these types of offenses; (2) while the case was serious, the totality of the circumstances show that confinement was not necessary to avoid depreciating the seriousness of the offense; (3) the defendant's absence of a lengthy criminal history; and (4) the defendant's attendance of classes and programs to address rehabilitative issues such as anger management.

The defendant does not appear in his argument to contest any of the court's specific consideration as improper. Moreover, our reading of these extensive findings can lead only to the conclusion that the trial court considered all the required sentencing principles, as well as the facts and circumstances of the case. As such, the trial court's sentencing determination to impose confinement is reviewed with a presumption of correctness. We conclude that the record is replete with evidence supporting the trial court's determination to impose confinement in this case.

As noted by the trial court, the defendant, who pled guilty to a Class B felony, is not considered as a favorable candidate for alternative sentencing, but does remain eligible for a sentence of probation. As such, the State is not required to establish proof of evidence to the contrary, *i.e.*, confinement is necessary to avoid depreciating the seriousness of the offense; rather, the defendant must establish his suitability for probation. Nonetheless, the trial court did in fact make such a finding with regard to the depreciation of the offense. On this record, there was no error in the trial court's determination that the defendant failed to meet his burden.

We must agree with the trial court that the circumstances of the offense in this case were such that they outweighed any factor favoring an alternative sentence. The victim, a mere two months old, was taken to the hospital and required medical intervention to sustain her life. Testing discovered, in addition to the severe head trauma she was currently suffering from, fourteen healing fractures. As a result of these injuries, which the victim's foster mother described as the worst she had seen in a case of shaken baby syndrome, the victim has faced several development challenges in her daily life, and her quality of life will likely be adversely affected forever.

Moreover, the trial court appropriately discussed and applied mitigating and enhancing factors. Contrary to the defendant's reliance upon his slight criminal record, that fact was noted by the trial court. While the court did give some weight to the defendant's convictions as an enhancement factor, it was not given overwhelming weight. Consideration

of that factor was appropriate, as the defendant did in fact has two prior criminal convictions, which he did not dispute. Additionally, the court considered the defendant's potential for rehabilitation and found it to be extremely lacking. The trial court made credibility findings, noted the defendant's lack of true remorse, his refusal to accept any responsibility for the victim's injuries, and the reports made during the defendant's counseling sessions. After review, we conclude that absolutely nothing in the record indicates error in the court's determination that the defendant had failed to establish his entitlement to a sentence of probation.

## CONCLUSION

Based upon the foregoing, the sentence of confinement is affirmed as imposed.

_____

JOHN EVERETT WILLIAMS, JUDGE